# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 1, 2009

## STATE OF TENNESSEE v. DONALD RAGLAND

**Appeal from the Criminal Court for Shelby County**
**No. 06-06182      W. Mark Ward, Judge**

---

### No. W2008-02065-CCA-R3-CD  - Filed December 15, 2009

---

The Defendant, Donald Ragland, was convicted by a jury of one count of first degree premeditated murder.  See Tenn. Code Ann. § 39-13-202.  He was sentenced to life, with the possibility of parole, in the Department of Correction.  In this direct appeal, he contends that: (1) the trial court erred in denying his motion to suppress a statement he made to police; (2) the trial court erred in excluding a certified copy of a traffic citation received by the Defendant's alibi witness; and (3) the State presented evidence insufficient to convict him.  After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Jeff Woods, Memphis, Tennessee, for the appellant, Donald Ragland.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Reginald Henderson and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual Background
Testimony in this case was heard at a suppression hearing held on November 16 and December 7, 2007, and at a jury trial held from June 4 through 6, 2008.  The crime at issue in this case occurred on December 9, 2005.

The hearing on the Defendant's motion to suppress concerned admission of an inculpatory statement made by the Defendant during an interview with Memphis police.  Memphis Homicide Detective Eric Hutchison testified at the hearing that he was called to St. Elmo's Market in Memphis

at about 4:00 p.m. on December 9, 2005, to investigate the shooting death of the victim, LaAunzae Grady. During the course of his investigation, friends and relatives of the victim informed Det. Hutchison that the Defendant, the older brother of a man killed by the victim a few years before, had said he intended to kill the victim. He also learned that an eyewitness saw the victim's killer fleeing in a white Jeep Cherokee, the type of vehicle operated by the Defendant.

This information led Det. Hutchison and his partner, Sergeant Caroline Mason, to look for the Defendant. They found the Defendant at his girlfriend's house on December 12, 2005, and arrested him on the basis of an outstanding arrest warrant for a traffic offense. A uniformed officer drove the Defendant to the Memphis Police Department homicide office and placed him in an interview room.

Detective Hutchison and Sgt. Mason then read the Defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant agreed to speak with them and waived his right to a lawyer. He then claimed to have been at work until about 3:00 p.m. on December 9. He began to feel sick at work at that time and left. The Defendant soon changed his story, however, and began to detail his involvement in a five or six-person conspiracy to kill the victim, as well as the roles of his supposed coconspirators: two men had lured the victim to St. Elmo's Market, another had told the Defendant that the victim was inside, and two more had lured the victim outside to be shot. The Defendant implicated himself by noting that he took off the ski mask he wore during the shooting. The Defendant did not give a written statement during the December 12 interview.

Detective Hutchison and Sgt. Mason decided to keep the Defendant in jail for forty-eight hours on his previous arrest warrant while they investigated his story. Investigation on the evening of December 12 led Det. Hutchison to believe that the Defendant had lied about having co-conspirators, although the persons named by the Defendant included people who were present at St. Elmo's Market at the time of the crime. Detective Hutchison and Sgt. Mason brought the Defendant back to the homicide interview room on December 13, 2005. The Defendant signed a Miranda waiver form, and he proceeded to give an extensive statement in which he admitted his responsibility for killing the victim and detailed the claimed roles of his co-conspirators. He was booked on murder charges. Detective Hutchison later received a call from an eyewitness named Michael Jones who said he had seen the killer flee from St. Elmo's Market while removing his ski mask. Mr. Jones said he could identify the killer. Mr. Jones later did so while viewing a six-person photographic lineup.

On cross-examination, Det. Hutchison noted that the victim was affiliated with a gang called the Vice Lords, while the Defendant and his brother were affiliated with the Gangster Disciples. Detective Hutchison also noted that the Defendant had been allowed to call his mother and his girlfriend and that he was given food and water during his interviews.

He also discussed the presence of cameras filming for a documentary television series called "The First 48." That series' cameras were allowed to film events in the interview room, although they were not present in the jail or while the victim was being driven to the homicide department.

Detective Hutchison recalled that cameras from "The First 48" recorded some of the Defendant's writing on a blackboard inside the interview room on December 13. Detective Hutchison did not recall the Defendant having written "I want a lawyer" or "I've been kidnapped" on the blackboard, but did recall that he had written a number of verses from the Bible. Detective Hutchison testified that the Defendant never said he wanted a lawyer.

Sergeant Mason also testified at the suppression hearing. She clarified that the Defendant originally claimed to have picked up one of his children at Coleman Elementary School after leaving work at 3:00 p.m. on December 9. She otherwise confirmed Det. Hutchison's account of their December 12 interview of the Defendant. As to the December 13 interview, Sgt. Mason said that the Defendant admitted to sole responsibility for the victim's murder after she told him she thought he was lying about his supposed co-conspirators. The Defendant said he had waited in front of St. Elmo's Market for the victim to exit. When the victim did so, the Defendant shot him. The Defendant then ran through a few nearby yards, coming out about two houses east of the store. He entered his vehicle and left.

Sergeant Mason affirmed that the Defendant had written "I need a lawyer" and "I've been kidnapped" on the chalkboard while she and Det. Hutchison were out of the interview room. When she returned to the interview room, Sgt. Mason accordingly asked the Defendant whether he wanted a lawyer. He unequivocally said that he did not. She also asked the Defendant whether he believed he had been kidnapped, and he responded in the negative. Sergeant Mason and Det. Hutchison then took the Defendant's incriminating statement. Cameras for "The First 48" were not present when the statement was taken. The Defendant's girlfriend contacted Sgt. Mason on December 19 and informed her that the Defendant wanted to speak to her again; the Defendant arranged another meeting in which he denied the truth of his confession.

During cross-examination, Sgt. Mason noted that the December 13 interview lasted from 12:13 to 8:50 p.m. At 8:50 p.m., the Defendant began to give his statement. He concluded at 10:38 p.m. No one besides Sgt. Mason and Det. Hutchison talked to the Defendant during this period.

The Defendant testified at his suppression hearing. He said that he was at his girlfriend's house on December 12 when officers arrived. They entered the house and told him he could not leave. Sergeant Mason and Det. Hutchison arrived shortly thereafter and handcuffed him. They did not read him his rights, tell him he was under arrest, or mention the warrant for his arrest. He was transported to the homicide interview room and shackled to the table therein. No one read the Defendant his Miranda rights before the interview began.

The Defendant asked for a lawyer after being interviewed for about two hours on December 12. Detective Hutchison responded, "What did I need a lawyer for. They said the only thing a lawyer was going to do is get all your money and then you're in jail." The Defendant said he was not advised of his Miranda rights on December 13 until about noon. He also asked for a lawyer, but received the same response as the day before. The Defendant was shown the waiver Sgt. Mason claimed he signed on that day; he said that the form he signed said much less than the one in

evidence and that he did not recognize the signature on the form in evidence. The Defendant did sign some form, however, after being told that he had to do so in order to return to the jail.

While Sgt. Mason and Det. Hutchison were out of the interview room, the Defendant wrote "was [he] arrested or kidnapped and [he] wasn't guilty until proven innocent and that [he] wanted a lawyer" on the blackboard. He pointed to this written request for a lawyer as Sgt. Mason and Det. Hutchison reentered the room, but they did not respond.

The Defendant acknowledged giving a statement on December 13, but said that he did not give the six-page statement in evidence. The statement he signed had been only two pages long, and he said that all of the information in the six-page statement was incorrect. The Defendant was only allowed to go to the bathroom once on December 13, before the interview began. He was only given water once and could not recall being given food. The Defendant acknowledged speaking to Sgt. Mason a third time on December 19. He again said that the rights waiver Sgt. Mason claimed he signed on that day appeared to have things added to it, although he did recognize it as containing his signature.

On cross-examination, the Defendant admitted he had been arrested and questioned many times before, and he had pleaded guilty to felonies in the past. He changed his mind and admitted that the December 13 rights waiver contained his signature. He said he did not initial each page of the six-page statement and had never seen those initials before, although he did sign the sixth page.

The trial court denied the Defendant's motion to suppress in an order dated January 11, 2008.

This case then proceeded to trial, where the State first presented the testimony of Officer James Watts of the Memphis Police Department. While on patrol on December 9, 2005, Officer Watts responded to a call from St. Elmo's Market. It was still light out when he received the call. Upon arriving at the market, Officer Watts saw a black male lying on the ground in front of the store "taking his last breaths." His head rested on a concrete parking barrier. He appeared to have been shot in the abdomen and was unable to speak. He was holding his stomach area, and someone had covered him with a jacket. Officer Watts noted a number of shell casings in the immediate area. He did not see a gun. A few other people were in the area, although Officer Watts did not see anyone tending to the victim. Officer Watts called for paramedics, who arrived shortly thereafter, followed by crime scene technicians and homicide detectives.

Memphis resident Corithian McClatcher testified that between 4:00 and 4:30 p.m. on December 9, 2005, he and his cousin's husband, Earnest Prince, drove his girlfriend's Cadillac to St. Elmo's Market. Mr. McClatcher had picked up Mr. Prince about two blocks away. As the two drove into the store's parking lot, Mr. McClatcher noticed a tall, thin male in a black jacket and black ski mask standing in front of the store with his hands in his pockets. Mr. McClatcher said to Mr. Prince, "there goes somebody standing over there with a mask." Mr. McClatcher stayed in the car while Mr. Prince went into the store. He saw Mr. Prince say something to the masked man as he

entered. A few minutes later, Mr. Prince exited the store and returned to the vehicle, at which time Mr. McClatcher drove away.

That evening, Mr. Prince told Mr. McClatcher that police wanted to talk to him about a crime that had occurred after they left St. Elmo's Market. Mr. McClatcher met Det. Hutchison and Sgt. Mason on December 10, and he gave a statement. A few days later, the police contacted him again and told him the Defendant had stated that McClatcher was involved in the shooting. He denied any involvement.

Mr. Prince confirmed that he visited St. Elmo's Market with Mr. McClatcher. He testified that, as he entered the store, he saw Dewayne Hall, a store employee. Mr. Prince also saw and recognized the victim, whom he had known for his entire life. Mr. Prince told the people in the store about the masked man outside, but they were "nonchalant." The victim seemed nervous, however, and said, "I got my pistol too, mother fucker. You know it. I'm going to pop his ass." Mr. Prince did not see a gun, however. After buying some beer, Mr. Prince left the store and drove away. He returned by himself at about 10:00 p.m. that evening and learned from Sgt. Mason that the victim had been killed. A former Vice Lord, Mr. Prince was taken into custody and held as a suspect. He denied any involvement in the victim's murder and was released on December 12.

Natalie Thomas testified that she drove her pink Dodge Shadow to St. Elmo's Market some time between 4:00 and 4:30 p.m. on December 9. As she pulled into a parking space, she saw a tall, thin male in a ski mask standing by the fence to the right of the store. She then saw a black male exit the store. The man in the ski mask walked toward him, took out a gun, and shot him four or five times. The shooter held the gun with his left hand. Ms. Thomas said the victim did not have a gun. The shooter then ran away. Ms. Thomas called 911. A moment later, a white Cadillac with two men inside pulled up. Ms. Thomas stayed on the scene until police arrived.

Dewayne Hall testified that he worked at St. Elmo's Market on December 9. Between 4:15 and 4:30 p.m. on that day, Mr. Prince came into the store and said a masked man was standing outside. Mr. Hall looked outside and saw the man standing with his hands in his pockets near the fence on the right side of the store. This was very unusual. The victim was present in the store and also saw the masked man; he did not seem concerned, however.

Mr. Prince left the store. The victim left the store shortly thereafter. Mr. Hall stood near the store's front door as the victim exited; he saw the masked man shoot the victim five or six times. The shooter held the gun in his left hand. Mr. Hall was almost hit; he ran to the back of the store. When he returned to the front of the store, he saw the victim lying on the ground outside. The shooter was gone. Mr. Hall gave a statement to police at about 2:00 a.m. on December 10.

Michael Jones testified that he went to St. Elmo's Market on December 9 to buy beer for his mother-in-law. He bought the beer and left and noted that he saw the victim in the store. After walking back to his mother-in-law's house about two blocks away, Mr. Jones realized he forgot to buy "blunts." He and a friend then drove Mr. Jones' white Cadillac back to the store. On the way,

they saw a man walking toward them with a "zoned-out look on his face." The man looked like he was carrying something in his pockets. Mr. Jones joked with his friend that the man had a look on his face like "he did something."

Mr. Jones arrived back at St. Elmo's Market about ten minutes after he had left. As he pulled into the parking lot, he saw the victim lying on the ground in front of the store. The victim's eyes were rolled back into his head, and he was trying to breathe. The victim did not say anything. Mr. Jones prayed with the victim. He did not see a gun in the victim's possession or around the victim.

Police and paramedics arrived about seven or eight minutes later. Mr. Jones remained on the scene for about thirty minutes before leaving. He did not think to give his contact information to police or tell police about the man he saw walking away from the store. Detective Hutchison and Sgt. Mason, having received his contact information from another witness, called him and asked him to look at a photographic lineup. Mr. Jones did so on December 12 after signing an "Advice to Witness Viewing Photographic Display" form. Mr. Jones identified the Defendant as the man he had seen walking away from St. Elmo's Market; he noted that he was not "100% sure," however. He had never seen the Defendant before.

Sergeant Mason also testified at trial. She arrived at St. Elmo's Market after the shooting and learned that the victim had died after being transported to Regional Medical Center. She originally suspected Mr. Prince; she and Det. Hutchison eliminated him as a suspect after questioning him, however. Sergeant Mason then largely reiterated her testimony at the suppression hearing regarding her and Det. Hutchison's interactions with the Defendant. She added that the Defendant originally claimed in the December 12 interview to have been working at a temporary agency on December 9 until he drove to pick up his child at 3:00 p.m. He could not remember the name of the agency, however, and later admitted he was not at an agency.

Sergeant Mason introduced relevant documents from the Defendant's December 13 interview. The Defendant's waiver of rights form was presented to him at 11:48 a.m. on that day. It contains his signature and was witnessed by Sgt. Mason and Det. Hutchison at 12:13 p.m. The Defendant's "Homicide Defendant Statement" indicates that it began at 8:50 p.m. that evening. The statement contains typed questions asked by Det. Hutchison and Sgt. Mason, as well as the Defendant's answers. Sergeant Mason clarified that she typed the Defendant's answers as he gave them.

The statement form begins with a <u>Miranda</u> warning and continues as follows:

Q: Do you understand each of these rights I have explained to you?
A: Yes. [Defendant's initials]

Q: Do you wish to make a statement now?
A: Yes. [Defendant's initials]

The first through fifth pages bear the Defendant's initials on the bottom right corner of each page. The sixth page contains the Defendant's signature and notes a time of 10:38 p.m. on December 13. The statement contains the Defendant's admission that he shot the victim at St. Elmo's Market, although he claimed to have been assisted by Mr. Prince, Mr. Hall, a man nicknamed "Peanut," a man nicknamed "J Black," Tremaine Logan, "another guy with a star up under his eye, and a brown skinned guy with a low haircut that drove a brown Buick." The Defendant said "J Black" gave him $1,700 and some cocaine, ecstasy and marijuana to kill the victim. Mr. Logan lured the victim to the store, while Mr. Prince and "Peanut" provided the Defendant with the ski mask and murder weapon. Mr. Hall supposedly acted as a lookout in the store, while the "guy with a star up under his eye" waited down the street to help the Defendant dispose of the evidence.

Mr. Prince and the "brown skinned guy" in the Buick drove up beside the Defendant before the shooting and confirmed that he was ready. The Defendant said Mr. Prince then proceeded to St. Elmo's Market, where he helped lure the victim out of the store. The Defendant then shot the victim. He said that he was supposed to be driven away from the scene after handing over the evidence, but that the "guy with the star up under his eye" drove away without him after receiving the murder weapon. The Defendant then panicked and ran to his truck. He confirmed that he removed his ski mask as he reached the street after running through a few nearby yards.

The Defendant said he was a member of the Gangster Disciples, but that the victim and the Defendant's co-conspirators were all Vice Lords. He believed the victim had been targeted by the other Vice Lords "due to unloyalty and lack of trust." The Defendant said the victim's role in his brother's 1999 murder contributed to his decision to kill the victim. The Defendant also said, however, that he and his family had been threatened if he chose not to cooperate, that he was under the influence of cocaine and ecstasy during the shooting, and that, although he thought he would feel better by avenging his brother's death, he "[felt] worse than [he] did before [he] shot [the victim]."

After recounting the Defendant's statement, Sergeant Mason again affirmed that further investigation revealed as fictitious the Defendant's claim to have worked with coconspirators. She also discussed her final conversation with the Defendant, on December 19, in which he wanted to withdraw his statement.

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation testified after being certified as an expert in firearms identification and examination. The Memphis Police Department's crime scene unit sent her seven shell casings, a bullet jacket, and a bullet core from the St. Elmo's Market crime scene. She also received a nine millimeter jacketed hollow-point bullet and a nine millimeter total metal jacketed bullet that had been removed from the victim's body. Her examination determined that all of the recovered shell casings were fired from the same nine millimeter firearm. She also concluded with certainty that the bullet jacket found at the store was fired from the same firearm as one of the bullets recovered from the victim's body; the second bullet in the victim's body could have been fired from the same firearm as the other two, but the bullet was too damaged for her to be certain.

Doctor Kenneth Snell performed an autopsy on the victim. He testified that the victim suffered two gunshot wounds to the left side of his mid-back, one to the upper left buttock, and one that entered the back of his right thumb, exited that thumb, and entered his forearm. None of the entrance wounds evidenced any gunpowder stippling, meaning that the bullets were not fired from extremely close range. Doctor Snell introduced a diagram of the wounds and a number of photos of the victim's body. The bullets damaged the victim's liver, third lumbar vertebrae, aorta, adrenal gland, and pancreas, and caused his death.

The Defendant chose not to testify, but presented the testimony of his girlfriend, LaTonya Tuggle-Bennett. She testified that, on December 9, she and the Defendant were driving together after they left work at about 3:00 p.m. They were pulled over by a Shelby County Sheriff's deputy and cited for a vehicle license plate violation. They arrived home at about 4:00 p.m., where they both stayed with their first child until 9:00 p.m. Ms. Tuggle-Bennett then went to Wal-Mart. The Defendant was still at home when she returned. On cross-examination, Ms. Tuggle-Bennett admitted she had not mentioned this alibi until the weekend before trial; she said she had assumed the Defendant and his lawyer were taking care of the matter and did not need her help.

The Defendant was convicted of one count of first degree murder. He now appeals.


**Analysis**

## I. Denial of Motion to Suppress the Defendant's Statement

The Defendant first contends that the trial court erred in denying his motion to suppress his inculpatory statement because he requested a lawyer before giving the statement and because the police lacked probable cause to arrest him for murder. "[A] trial court's findings of fact at a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). However, we review de novo a trial court's application of law to the facts. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

### A. Request for a Lawyer

The Fifth Amendment to the United States Constitution provides, in relevant part, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Likewise, the Tennessee Constitution guarantees that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. An accused may waive these rights, however, the waiver must be voluntary, knowing, and intelligent. Miranda, 384 U.S. at 444. Moreover, "the accused must be adequately and effectively apprized of his rights and the exercise of those rights must be fully honored." Id. at 467.

In Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the United States Supreme Court held that police officers must immediately cease questioning a suspect once the suspect clearly asserts his or her right to have counsel present during custodial interrogation. The suspect's request for an attorney during any further questioning must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). Our supreme court has held that "[t]he standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 [of the Tennessee Constitution] and the Fifth Amendment [to the United States Constitution]." State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003). Accordingly, if the accused's statement fails to meet the requisite level of clarity, the officers are not required to stop the interrogation to clarify any equivocal request for counsel. Id. Whether a suspect makes an equivocal or an unequivocal request for an attorney is a question of fact. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).

After our review of the record, we conclude that the trial court did not err in holding that the Defendant did not make an unequivocal request for a lawyer. While we accept that the statement "I need a lawyer" is unambiguous, we think that under these circumstances Sgt. Mason was understandably unsure whether the Defendant actually intended the statement to request a lawyer, given that he wrote it on the blackboard, amidst a number of other statements, while alone in the interview room. The Defendant also did not, for instance, draw Sgt. Mason's attention to the statement upon her return. In our view, Sgt. Mason acted reasonably in simply clarifying with the Defendant whether he wanted a lawyer. He responded that he did not. This issue is without merit.

**B. Probable Cause to Arrest**
The Defendant also contends that the trial court erred in denying his motion to suppress because the police lacked probable cause to arrest him for the victim's murder. He concedes that the police properly arrested him on an outstanding arrest warrant for a previous traffic offense, but argues that this warrant was insufficient to allow the police to hold him for questioning on the instant murder charge.

We need not address this contention, however, because we agree with the trial court's holding that the police had probable cause to hold the Defendant as a suspect in the victim's murder. The trial court found that the police knew, when they arrested the Defendant, that: (1) the Defendant had vowed to kill the victim; (2) he operated a white Jeep Cherokee, a type of car seen in the area at the time of the murder; and (3) the Defendant and the victim's killer were both left-handed.

"Probable cause requires only the existence of such facts and circumstances sufficient to excite in a reasonable mind the belief that the accused is guilty of the crime charged." Roberts v. Federal Express Corp., 842 S.W.2d 246, 248 (Tenn. 1992). After a review of the record, we conclude that the evidence does not preponderate against the findings of fact underlying the trial court's conclusion that the police had probable cause to believe the Defendant had killed the victim. We also conclude that the trial court properly held that those facts met the standard for probable cause. This issue is without merit.

## II. Exclusion of Traffic Citation

During the Defendant's examination of his alibi witness, Ms. Tuggle-Bennett, he attempted to introduce a certified copy of the traffic citation she said she received while driving with the Defendant on the afternoon of December 9. The trial court excluded the traffic citation as irrelevant.

Only relevant evidence is admissible. See Tenn. R. Evid. 402. Tennessee Rules of Evidence 401 and 403 govern whether evidence is relevant. Trial courts have broad discretion in assessing relevance, and we will not overturn their decisions absent an abuse of that discretion. State v. Stinnett, 958 S.W.2d 329, 331 (Tenn.1997), State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

We conclude that the trial court did not abuse its discretion in excluding Ms. Tuggle-Bennett's traffic citation. The citation did not contain the Defendant's name or any other information establishing that he was present with her during the traffic stop. Although it had a tendency to make more probable the fact that Ms. Tuggle-Bennett was stopped, it had no tendency to make more probable the fact that the Defendant was with her. The trial court properly held that the citation was irrelevant.

We will also briefly address the Defendant's further contention that this ruling deprived him of his constitutional right to present a defense. We conclude admission of a traffic citation was not critical to his defense because it did not tend to establish his presence in the vehicle with Ms. Tuggle-Bennett; further, the judicial interest in admitting only relevant evidence is important to our judicial system. See State v. Flood, 219 S.W.3d 307, 16 (Tenn. 2007). This issue is without merit.

## III. Sufficiency of the Evidence

Finally, the Defendant contends that the State presented evidence insufficient to convict him of first degree murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree murder is a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a). "'[P]remeditation' is an act done after the exercise of reflection and judgment," meaning "that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Although the mind requires no particular length of time to form the requisite intent to kill, a Defendant must be "sufficiently free from excitement and passion to be capable of premeditation." Id. A jury may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660.

Our supreme court has enumerated a number of factors that may support the existence of premeditation. These include (1) declarations by the defendant of an intent to kill; (2) evidence of procurement of a weapon; (3) the use of a deadly weapon upon an unarmed victim; (4) the particular cruelty of the killing; (5) infliction of multiple wounds; (6) preparation before the killing for concealment of the crime; (7) destruction or secretion of evidence of the murder; and (8) calmness immediately after the killing. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

The Defendant's identity as the victim's killer was established directly by his statement to police. It was also established circumstantially by eyewitness testimony placing him near St. Elmo's Market at the time of the murder. The Defendant's statement also established premeditation, as he admitted to a desire to avenge his brother's death and engaged in planning for that purpose. Witness testimony further established that the Defendant wore a mask to conceal his identity and waited, with a gun, for the victim to exit St. Elmo's Market. We conclude this evidence is sufficient to support the jury's verdict finding the Defendant guilty of first degree premeditated murder beyond a reasonable doubt.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction for first degree murder.

_____
DAVID H. WELLES, JUDGE

-11-